This litigation is concerned with the title to three parcels of real estate in the City of Passaic. Two of the tracts, known respectively as 170 and 172 Lafayette Avenue, have houses upon them. The third parcel is a vacant plot approximately 182 feet deep by 175 feet front and rear and lying on the southwesterly side of Paulison Avenue. The original plaintiffs were the widow and children of Joseph Pope, deceased. After the institution of the suit several creditors of Joseph Pope intervened as parties plaintiff and joined in the prayers for judgment. The defendants are Betty Bain, sister of Joseph Pope, her husband, Henry Bain, III, and one Saul Cohen. Record title to 170 and 172 Lafayette *Page 543 
Avenue is in Helen Bain. Title to the vacant land on Paulison Avenue is in Saul Cohen. Mr. Cohen in his answer disclaimed ownership and alleged that he holds title as security for a loan of $5,000 made to Joseph Pope.
The charge is that Joseph Pope supplied the consideration paid for the various purchases and that he was the real owner of the property, though title was taken in the name of Betty Bain. Plaintiffs seek a judgment declaring that title to the property is held by the defendants in trust for the plaintiffs.
Joseph Pope died intestate on June 27, 1947. Title to 170 Lafayette Avenue was taken in the name of Betty Bain on August 11, 1944. Title to 172 Lafayette Avenue was taken in the name of Betty Bain on March 4, 1946, and title to the Paulison Avenue property was taken in the name of Betty Bain on June 28, 1945. On July 19, 1946, Betty Bain and Henry Bain, III, her husband, conveyed the Paulison Avenue property to Saul Cohen.
From the evidence the following facts appear:
In 1944, Joseph Pope consulted one Murray Brussel, a business broker, with reference to the advisability of purchasing 170 Lafayette Avenue, Passaic. At Pope's request, Brussel examined the property, was favorably impressed and subsequently, as agent of Pope, signed a contract for its purchase. The price was $11,500, of which $2,500 was paid on the day the contract was signed. The balance of $9,000 was paid the day the deed was delivered. Pope had appeared at the office of Mr. Milton Werksman, an attorney, and instructed him to make the purchase in the name of Betty Bain. Pope gave to the attorney a check for $12,000, drawn on a Philadelphia bank, signed and endorsed by Betty Bain. Mr. Werksman deposited the check in his account and used his own checks to satisfy the payments required by the contract. The $12,000 had been deposited in the Philadelphia bank by Joseph Pope. He sent the $12,000 check for signature and endorsement to Mrs. Pope, who was living in Chicago.
Mr. Werksman testified that he acted on behalf of Mrs. Bain in the purchases of all the properties with which this litigation is concerned. However, he admitted that Mrs. Bain *Page 544 
never appeared. He was retained by Pope and all of his instructions came from Pope. Werksman's only contacts with Mrs. Bain were the letters he sent to her recounting his activities in connection with the various purchases.
In an action in the County Court involving the estate of Joseph Pope, Mrs. Bain testified that Pope had given her the $12,000 to use in the purchase of a house for their father and mother. At the hearing in this court the story was changed. Mrs. Bain testified that $9,000 of the $12,000 was supplied by her mother from a fund saved over the years from the family earnings and only $3,000 was donated by Joseph Pope. In this she was corroborated by her mother, Antoinette Popek, and her sister, Stella Popek. The fund from which the $9,000 was taken, according to them, was an accumulation of the savings of 20 years. It was kept in the inevitable tin box in a bureau.
Mr. Popek was a laborer in a bakery. Stella worked in a handkerchief factory and Betty, before her marriage, was a show girl. For upwards of 20 years they had lived in Garfield in what is known as a "cold water flat." It did not have heat, hot water or bathroom. There were two bedrooms. For these accommodations the Popeks paid rent of $22 per month. They testified that they decided that the Garfield flat was too crowded. Accordingly, after consultation with Joseph Pope, they purchased the house at 170 Lafayette Avenue, which was in the best residential section of Passaic. The house is large. It has five bedrooms and appropriate baths on the second floor. On the first floor there are two servant's bedrooms in addition to the usual living rooms. The taxes on this property are between $500 and $700 a year. It is plain that the house is too big for the needs of the Popeks. Four of the bedrooms are without furniture and have been closed. The dining room and another room on the first floor have been kept closed and unused.
I cannot believe the defendants' story. Assuming that they were thrifty enough to have saved $9,000 over the course of the years, it is inconceivable that they would use it all to acquire a house far too large for their needs in which they *Page 545 
could hardly be comfortable. I cannot believe that they would deliberately take on the large tax obligation to say nothing of the expenses of upkeep of such a large house. The story is not in character. I am convinced that the funds used in the purchase of 170 Lafayette Avenue came from Joseph Pope. Whether he bought the house for an investment or, as his wife says, to provide a home for her and the children, is immaterial. It was Pope's property and even though he had title placed in the name of Betty Bain, he continued to exercise complete dominion over it.
It is undisputed that the funds for the purchase of the Paulison Avenue tract came from Pope. Brussel and another broker testified that Pope bought the land as an investment; Stella Popek said Pope bought it to round out the family estate. Mrs. Bain said that Pope made a gift of the property to her. I do not believe either Stella or Betty. The property belonged to Pope and when he needed money, he obtained a loan of $5,000 from Mr. Cohen with the Paulison Avenue property as security. The property was conveyed to Cohen. He placed a $5,000 mortgage upon it and turned over the proceeds to Pope. The deed to Pope was executed by Mrs. Bain out of the state. It was witnessed by Joseph Pope whose proof was taken by Mr. Werksman for recording purposes. Again Mrs. Bain did not appear.
The property known as 172 Lafayette Avenue was purchased for the sum of $10,250. Pope negotiated the purchase, signed the contract and paid the entire purchase price in cash. Of the purchase price, $7,500 was raised by a mortgage upon 170 Lafayette Avenue. Mrs. Bain executed the mortgage in Florida, sent it to Pope, who turned it over to Mr. Werksman. The proceeds of the mortgage were deposited in an account opened in Mrs. Bain's name by Werksman. He then obtained from Betty Bain a power of attorney under the authority of which the $7,500 was withdrawn from the bank, turned over to Pope and used by him in the purchase of 172 Lafayette Avenue.
I am satisfied that the consideration paid for the purchase of these parcels of real property was supplied by *Page 546 
Joseph Pope. He took title in the name of Betty Bain but it is clear that he regarded himself as the owner. Under such circumstances a trust is presumed to arise in favor of the one paying the purchase price. This presumption may be overcome by evidence disclosing a contrary intent. But the proofs must be convincing and leave no doubt as to the intention of the parties.Cutler v. Tuttle, 19 N.J. Eq. 549; Herbert v. Alvord,75 N.J. Eq. 428. The proofs in this case have failed to overcome the presumption of a resulting trust.
The defendants maintain that even though it be determined that Joseph Pope was the beneficial owner of the property, these plaintiffs may not obtain relief from a court of equity since they come in with unclean hands. Defendants charge that Pope was engaged in a scheme to defraud his creditors. It appears that a judgment for $30,000 arising out of an automobile accident had been obtained against Pope in the courts of New York. This judgment was outstanding at the time of the acquisition of the first two parcels. The matter was subsequently settled. According to several witnesses, Pope told them that he was taking title in his sister's name because of the judgment. Assuming that Pope was guilty of conduct which would bar recovery in an action started by himself, I am still of the opinion that his dereliction cannot be charged against these plaintiffs. Certainly the creditors are not barred from inquiring into the circumstances surrounding the conveyances. Haston v. Castner, 31 N.J. Eq. 697. And the cry of unclean hands cannot be raised against the widow who was unaware of and had no part in the alleged scheme to defraud. Her estate of dower is not successional. Reese v. Stires,87 N.J. Eq. 32. Nor am I willing to invoke the doctrine against the children of Pope all of whom are minors. They certainly had no part in any fraudulent scheme. I am aware of those cases charging the misdeeds of the ancestor against the heirs at law, but this is a court of equity. The doctrine of unclean hands is an equitable doctrine designed to further the cause of equity and good conscience. To invoke that doctrine against Pope's children with the resultant unjust enrichment of the defendants *Page 547 
would be inequitable in the extreme. For this opinion I find support in Killeen v. Killeen, 141 N.J. Eq. 312.
There will be a judgment that the defendants hold the property in trust for the plaintiffs, subject, of course, to the several mortgages. There was a suggestion that the defendant, Betty Bain, had made certain expenditures in connection with the upkeep of the property. If this is so, and the parties can agree upon the amount of those expenditures, it may be incorporated in the judgment. Otherwise, a reference will be required.